## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

_____
)
KAREON SIERRA, A/K/A CARON SIERRA,    )
        Plaintiff,    )    Civil Action No. 3:15-cv-01520-JAM
)
)
v.    )
)
NEW ENGLAND PERSONNEL OF    )
HARTFORD, LLC, KATHRYN CLARK    )
MELANSON, and THOMAS MELANSON,    )
        Defendants.    )    MARCH 21, 2017
_____ )

## <u>DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>

### I.   Introduction

The defendants hereby file this opposition to the plaintiff's motion for summary judgment as to all grounds set forth by the plaintiff. The plaintiff seeks summary judgment as to her claim that she was not an exempt employee under the Fair Labor Standards Act ("FLSA") while under the employ of New England Personnel of Hartford, LLC ("NEP") and as a result was entitled to overtime payments for her work undertaken beyond forty hours in a given week.

The defendants submit that there are sufficient facts in dispute as to whether the plaintiff was exempt either as a bona fide administrative employee pursuant to 29 U.S.C. § 213(a)(1); and Connecticut General Statutes §31-76i(e) or alternatively as an

employee of a retail or service establishment pursuant to 29 U.S.C. §207(i) and Connecticut General Statutes §31-76i(g).

Because of the plaintiff's work as a self-guided, commission-driven recruiter, making an average gross annual income of over $100,000, her position was properly categorized as an exempt employee, not entitled to overtime. Given this, the plaintiff's other claims, dependent on the defendants' failure to pay overtime wages must also fail. At minimum, the plaintiff's claims are not ripe for summary judgment in her favor.

## II.   Facts Relevant to the Defendants' Opposition

The Defendants have filed, along with the Defendants' Memorandum in Opposition to the Plaintiff's Motion for Summary Judgment, a Defendant's Statement Pursuant to D.Conn.L.Civ.R. §56(a)(2) (hereinafter, "Rule 56(a)(2) Statement"), in which they sets out the facts of the case which are either undisputed or contested.

## III.   Legal Standard

Summary judgment is appropriate under Federal Rule of Civil Procedure 56(c) only when "the moving party establishes that there is no genuine issue of material fact to be resolved at trial and that the moving party is entitled to judgment as a matter of law." *Doe v. Derby Bd. Of Educ.*, 451 F.Supp. 2d 438, 442 (D. Conn. 20016)(*citing Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).   A party seeking summary judgment "bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish [its] right to judgment as a matter of law." *Rodriguez v. City of New York*, 72 F.3d 1051, 1060-61 (2d Cir. 1995) (*citing Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). "Where the record taken as a whole could not lead a

2

rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

In making a determination on a motion for summary judgment, the court is mandated to "resolve all ambiguities and draw all inferences in favor of the nonmoving party. . . ." *Coger v. Connecticut*, 309 F. Supp. 2d 274, 280 (D. Conn. 2004)(*quoting Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir. 1992), *cert. denied*, 506 U.S. 965 (1992). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991), *cert. denied*, 502 U.S. 849 (1991).

## IV.   THE PLAINTIFF HAS FAILED TO MEET HER BURDEN FOR SUMMARY JUDGMENT AS TO HER FLSA OVERTIME CLAIM

### A.   There exists a material dispute of fact as to whether the plaintiff has established all elements of a violation of the overtime provisions of FLSA

In her motion for summary judgment, the plaintiff seeks summary judgment as to the essential elements of her overtime claim against the defendants under FLSA. In arguing in favor of this the plaintiff states that she has established all of the elements pursuant to *Lundy v. Catholic Health System of Long Island Inc.*, 711 F.3d 106, 114 (2d Cir. 2013). In citing satisfaction of these elements, the plaintiff points to the fact that she has produced evidence that she did work in excess of 40 hour weeks while at NEP and that she was not compensated with time and a half for that additional time. While the defendants concede this point, it should be noted that these offerings are only sufficient to establishing a *prima facie* showing of a violation of FLSA and are not completely dispositive on the merits. Consequently, the defendants request that the Court reject the

plaintiff's request for judgment that the "plaintiff has shown a violation of the overtime provisions of FLSA." As is discussed more fully herein, other considerations weigh against a finding of such a violation.

### B. Plaintiff was an exempt employee under FLSA as a Bona Fide Administrative Employee

Contrary to the plaintiff's contentions in her motion for summary judgment and the supporting memorandum, the plaintiff has failed to produce evidence sufficient to warrant summary judgment on the issue of whether she was an exempt employee under FLSA. In fact, the evidence, in light of the applicable law demonstrates that the plaintiff was exempt under FLSA and therefore not entitled to overtime compensation for any time worked over forty hours in a given week.  Under FLSA, an employee must be paid overtime for any work beyond 40 hours per week, unless that worker is "employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. §213(a)(1).

### 1. The plaintiff performed work directly related to the management or general business operations of the Clients of NEP

In support of her motion for summary judgment, the plaintiff claims that she did not perform work related to management policies or general business operations in her work for NEP. However, this argument is based on an incorrect characterization of the plaintiff's work for the customers of NEP.  Under FLSA, an employee may fall into the administrative exemption of employment if "an employee's primary duty [is] the performance of work directly related to the management or general business operations of the employer or the *employer's customers*." 29 C.F.R. 541.201(a)(emphasis added).

4

In support of her motion for summary judgment, the plaintiff attempts to characterize her services to NEP's customers as a product and not a service directly related to the management of NEP's customers. This argument must fail. The nature of the plaintiff's work for NEP, in light of the statutory and regulatory framework of FLSA, directly related to the management or general business operations of NEP's customers through providing a human resource and staffing function.

The plaintiff contends that the fact that NEP provided staffing as a service essentially meant that her function was not related to management or general business operations. Pl. Memo at p. 9 ("Thus, the plaintiff's duties were not directed to the general operation of NEP, but to NEP's ability to provide a product – the placement of candidates in vacant positions with clients' businesses.")

However, the fact that NEP was in the business of providing personnel recruitment to its customers is of no moment in determining whether the plaintiff was an exempt administrative employee. When an employee provides services to an employer's customers, the analysis should focus on the nature of the services being provided to the customer, not on whether such service is the primary purpose of the employer's business. *See e.g. Desmond v. PNGI Charles Town Gaming,* LLC, 564 F.3d 688, 693 (4th Cir. 2009). Otherwise, under the plaintiff's construction of the rule, an attorney, working for a law firm should be characterized as exempt under FLSA merely because the attorney sells the firms "product" of legal services to its customers.

Obviously, this is a result that cannot stand under FLSA, *see* 29 C.F.R. §541.201[1], and neither can the similar result, advocated by the plaintiff.

Quite to the contrary of the plaintiff's assertion, the phrase "directly related to management or general business operations" has consistently been held to refer to the type of work performed by the employee. *Desmond*, 564 F.3d at 693. The Department of Labor ("DOL") has interpreted such work to include "work in functional areas such as…personnel management; human resources; employee benefits; [and] labor relations." 29 C.F.R. §541.201(b). Furthermore, DOL interpretive regulations state that employees may qualify for the administrative exemption not only if they perform such duties for their employer, but also if they do so for their employer's clients by 'acting as advisers or consultants to their employer's clients or customers… 29 C.F.R. §541.201(c).

In weighing in on situation's similar to that of the plaintiff, the DOL has routinely advised that recruiting on behalf of the clients of an employer is characterized as work that is directly related to management or general business operations under FLSA. *See Dept. of Labor Op. Ltr.*, 2005 DOL WH LEXIS 59 (Oct. 25, 2005)(deeming "recruiting, hiring, and managing temporary labor pool of [the agency's] clients" as being related to management or general business operations of the employer's clients); *Dep't of Labor Op. Ltr.*, 2000 DOL WH LEXIS 10 (Dec. 8, 2010)(advising that university technical recruiters who screened, tested and interviewed applicants for employment, and made personnel recommendations to hiring managers, were engaged in work directly related

---

[1] Defining work "directly related to the management or general business operations of the employer" as including "legal and regulatory compliance."

to management policies or business operations"). Similarly, district courts have routinely found that employees in a recruiting and staffing positions perform work "directly related to management or business operations of their employers or their employer's clients." *Andrade v. Aerotek, Inc.*, 700 F.Supp.2d 738 (D. Md. 2010); *Hudkins v. Maxim Healthcare Servs., 39 F. Supp. 2d 1349, 1349-50 (M.D. Fla. 1998)(*holding that the primary duty of a recruiter at company that placed nurses in hospitals "was directly related to the Defendant's general business operation); *Goff v. Bayada Nurses, Inc., 424 F. Supp. 2d 816, 824 (E.D. Pa. 2006).*

Not only do the defendants dispute the plaintiff's claims that her work was not directed "to the management or general business operations of the employer or the employer's customers," but in fact, the available evidence is undisputed that the plaintiff acted as a recruiter for the defendants and therefore was engaged in employment primarily focused on the management and general business operations of NEP's clients. The executive recruiter job function, which the defendant, Kathryn Melanson testified had been consistent throughout the thirty-three year period of NEP's business, was clearly one of a personnel recruiter that would qualify as exempt under FLSA. *See* Exhibit A, Deposition Transcripts of Kathryn Melanson Tr. 14:16-15:15; Pl. Ex. 6-B. As a recruiter, the plaintiff was providing the type of personnel management and human resources services that should be considered to directly relate to the management and business operations of the defendants' business and their clients. As such, summary judgment is inappropriate on this ground.

2.      **Plaintiff customarily and regularly exercised discretion and independent judgment**

In her motion for summary judgment, the plaintiff identifies various guidelines and criteria, mandated by the defendants, which she argues deprived her of virtually all discretion in her position. On the contrary, the available evidence shows that the plaintiff's position required a great degree of discretion and independent judgment and that the restrictions created by the defendants were either preliminary guidelines or related to largely administrative aspects of the plaintiff's job, which did not constitute the majority of her job function.

As Ms. Melanson testified during her deposition, the Executive Recruiter job description (Plaintiff's Exhibit 6-B) captured the job duties of the plaintiff as well as every other executive recruiter who had previously worked for the defendants. (Exhibit A, Tr. 15:7-11; 16-18-23; 30:4-30:8). This job description, by its own terms, describes the plaintiff's job with NEP as requiring a significant degree independent judgment.

The plaintiff's job entailed various broad categories of work, for which the plaintiff was entrusted with broad discretion. The plaintiff's job function included finding candidates to fill employment positions for NEP's clients, which included "devis[ing] and carry[ing] out a targeted research strategy, including networking…[i]dentifying candidates in the marketplace working for competitors who are not currently looking for new employment…[c]reatively develop[ing] and determin[ing] strategy to motivate and manage methods to engage identified candidates in the interviewing and job seeking process." Pl. Ex. 6-B at p.1. In regards to the plaintiff's responsibility to identify new

candidates for NEP, the plaintiff's job description lays out broad results that the plaintiff is entrusted with producing without overly specific guidelines as to how to accomplish that work.

Aside from identifying potential candidates for NEP's clients, the plaintiff was responsible for independently evaluating and recommending candidates for placement into positions with NEP's various employer-clients. In her position, the plaintiff was charged with "analyz[ing] a candidate's experience…investigat[ing] a candidate's qualifications," which included independently determining how or whether to check a candidate's references. Pl. Ex. 6-B at pp.1-2. Without any other instruction, the plaintiff was responsible for determining whether a candidate was appropriate for a given client based on the plaintiff's "detailed understanding of the client needs and desires" as well as on "cultural fit and capability." Pl. Ex. 6-B at p.2.

As Ms. Melanson testified during her deposition, from the point that a candidate first came to NEP to be placed with one of NEP's clients, through the evaluation, she was completely uninvolved. Exhibit A, Tr. 104:3-9. As an executive recruiter, the plaintiff was completely responsible for identifying and evaluating the qualifications and fit of a candidate. Exhibit A,Tr. 104:12-16 According to Ms. Melanson, it was up to the recruiter to decide whether a candidate was "on-point" for a particular position. Exhibit A, Tr. 104:6-7. Thereafter, it was the recruiter's responsibility to have a conversation with Ms. Melanson as to whether the candidate was appropriate for the particular position. Exhibit A, Tr. 104:12-13. This conversation would involve the recruiter revising a candidate's resume and writing up reasons as to why the given candidate was qualified for the position in question. Exhibit A, Tr. 107:1-107:9. This entire process required that

the plaintiff independently evaluate a candidate and come to a decision before making a recommendation to Kathryn Melanson.

As noted in the plaintiff's motion for summary judgment, the decision of whether to present a candidate to a client employer ultimately belonged to Ms. Melanson. However, the fact that an administrative employee is subject to supervision is not fatal to a claim that an employee is exempt from overtime compensation. *Andrade*, 700 F.Supp.2d at 748 *citing West v. Anne Arundel County*, 137 F.3d 752, 764 (4th Cir. 1998). The available evidence indicates that Ms. Melanson, in fact, exerted only minimal supervision in deciding whether or not to present a candidate to a client based on a recruiter's recommendation. From her testimony, Ms. Melanson indicated that she would reject the recommendation of a recruiter if it became apparent that the recommendation had a deficiency, saying:

> It was a discussion with me and the recruiter, and if the recruiter -- for example, if a candidate was extremely jumpy and the recruiter did not have reasons for leaving or the reasons for leaving were very poor and they were not going to be indicative of a stable candidate, but the recruiter was interested in just getting the candidate out there in the market, and I knew it would do more damage than it was going to do potentially good, we would have that discussion.  And I would say if you can get more substantive reasons about the candidate's reasons for leaving, then we can proceed. So it was a discussion of quality versus quantity when it came to candidate presentations.

Exhibit A, Tr. 108:12-24. Moreover, Ms. Melanson indicated that her determination was based on the information provided to her by recruiters rather than her own evaluation since an individual recruiter was more familiar with each candidate. Exhibit A, Tr. 107:18-108:2. Given Melanson's reliance on the information and analysis of the plaintiff and other recruiters and her role of simply

identifying glaring deficiencies in a recruiter's research about a given candidate, it would be inappropriate to find that such supervision vitiated any independent judgment on the part of the plaintiff or the discretionary aspects of her job.

Similarly, the other guidelines and criteria, pointed to by the plaintiff in support of her motion for summary judgment, are largely administrative and not related to the substance of the plaintiff's job function. Pl. Ex. 6C-6H. These guidelines relate to the maintenance of files and answering of telephones in the office, among other things. Other guidelines relate to the bare minimum information needed in a file in order to consider a candidate for a given position.

The memos and guidelines, identified by the plaintiff, that did set forth the manner in which the recruiters would do their jobs were basic and lacked precise detail. They did not dictate such strict procedures as to deprive the plaintiff of independent judgment or discretion in carrying out her tasks. The first memo, cited by the plaintiff, entitled "NEP PROTOCAL WITH CONTACTING CANDIDATES, THE FOLLOWING SYSTEM IS MANDATORY TO BE FOLLOWED WITH EACH CANDIDATE CALLOUT," set forth the procedures for contacting a candidate for a position with one of NEP's clients. Pl Ex. 6-C.  The vast majority of the information conveyed by this memo was in regards to what medium to use to contact a candidate and what information was needed at a minimum for NEP's file when contacting such a candidate. This memo contained no guidelines as to how to select or evaluate a candidate – two of the major job functions of the plaintiff's position.

The memo from January 9, 2012, entitled "Daily Expectations at a Minimum" is yet another memo, circulated by the defendants, that dictated the clerical aspects of the plaintiff's job. The memo addressed maintenance of a separate file for each client as well as some of the basic information to be maintained, including contact information for candidates. Pl Ex. 6-D.  The memo also required the plaintiff and other recruiters to make an accounting of daily work – number of candidates reached, jobs discussed, and candidates successfully placed. *Id.* The final requirement of the memo was that recruiters make an accurate accounting of the "presents" that they had made to clients. Id. Each of these requirements, while specific and rigid, did not relate to the substance of the plaintiff's job, which was identifying and screening candidates. The fact that an employer requires meticulous records from its employees does not meant that the employee lacks all independence.

The plaintiff next points to a memo from Melanson that guided recruiters to get certain information in support of future salary and benefit negotiation, saying "If the candidate is giving you ##'s for $ that are not in line with where you need them to be OR you know that our client is going to be a hard negotiator, then find out how many hours they're working, overtime they're working, whether they are paid for ot, and their benefit contribution. This is all necessary when we do a negotiation." Pl Ex. 6-E. While this memo does have specific requirements on what information the plaintiff is to obtain from certain candidates, it does not serve to deprive the plaintiff or other recruiters of autonomy. At most, this memo serves as a guide as to a minimum of information that will be needed in order to

conduct a negotiation. The memo does not command how all of said information is to be used by the recruiter in her job function. Moreover, based on the plaintiff's claims, she was not involved in the negotiation aspect of the placement process. This information was to be gathered while the plaintiff was carrying out her other job functions. On its face, the memo merely requires the plaintiff to secure some information that will be useful in the future to one of her colleagues and does not impinge on the execution of her job function.

In her motion for summary judgment, the plaintiff further misconstrues, routine management and supervision, and open-ended suggestions from the defendants as rigid requirements. The plaintiff points to language from a memo stating that "[e]ven though we've spoken of this numerous times, we need to be firm with candidates on the following . . . ANOTHER OPTION – even if you've gotten the basics from the candidate, say to the candidate, do mefavor [sic], just briefly send me email with . . . and HAVE THE CANDIDATE EMAIL ALL THEIR RFL'S BASE SALARIES, BONUS ETC. Pl. Ex. 6-F. However, the plaintiff fails to highlight the broader context of this suggestion from the defendants. That same memo concludes by saying "If you've got a more efficient way to get accurate, verifiable info that's less painful for you, I'm all for it. If you've got a more efficient way to get the rfl's from candidates, let's do it!" Pl. Ex. 6-F. This statement by the defendants belies the plaintiff's claim that this memo and others were intended as strict requirements, depriving the plaintiff of independent thought in her own work. The defendants welcomed creativity and independent judgment, but

unsurprisingly, had some suggestions to improve efficiency and accuracy, based on the better part of three decades of experience.

Again, in support of her motion for summary judgment, the plaintiff cites an email from Ms. Melanson that advises the plaintiff to "OPEN YOUR CALL WITH CANDIDATE WITH AN OPEN ENDED QUESTION – let them speak, evaluate intelligence, lack of ums, uhhs" and stumbling." Pl. Ex. 6-G. The plaintiff presents this as a broad indictment of the defendants guiding every interaction that the recruiters had with candidates. However, once the entire email is reviewed, this turns out not to be the case. The email in question clearly is meant to orient the recruiters to the needs of an individual client – David. The email instructs the recruiters to pay special attention to the intelligence of candidates and their ability to think on their feet because "[David] is smart, little slick and perceptive to the intelligence level and business savvy of the candidate." Id. The content of the email indicates that Ms. Melanson had information that would be useful to her recruiters, and she shared it with them. This does not indicate a broader pattern of control on the part of the defendants.

Finally, the plaintiff cites a two-page memo from Ms. Melanson, highlighting the portion setting forth the following:

> FILING: with all filing, [sic] (billing, greens, all research, fax files) the candidate goes to the very front of file;" and "PHONES – pick up all incoming calls when at all possible first . . . The recruiter's responsibility will be to read immediately the message put in front of them and either immediately put their call on hold to take the call or instruct Spencer how they want the call handled . . .when finding misfiles, immediately pull the misfile . . . when someone coming to

> front door, Spence will greet. Buzz him if you notice guest and he
> hasn't heard.

(Id., Exhibit H). Once again, this memo simply relates to administration of paper files and handling of the phone system. It has no bearing on the plaintiff's exercise of discretion in evaluating and placing candidates for NEP's clients.

Ultimately, the plaintiff points to helpful suggestions from the defendants and office procedures for file maintenance and phone answering as completely depriving her of independence in her job. However, the plaintiff does not point to any guideline or list of criteria that instructs the plaintiff or the other recruiters as to how to perform their core job-function of evaluating candidates. Some of the memos require certain information to be collected, but nowhere is it dictated how to interpret such information or how to apply it in the recruitment process. There lies the independent judgment that the plaintiff was regularly relied upon to exercise, which requires that she be considered exempt. As Ms. Melanson testified, the executive recruiter position "was an independent role where you had independent thinking, judgment. It was critical that someone be able to direct their own day, direct their own efforts, make independent decisions." Exhibit A, Tr. 95:1-95:8. None of the evidence cited by the plaintiff contradicts this statement in any way. As such, summary judgment is inappropriate as to this claim.

### C. Plaintiff was exempt from overtime requirements under FLSA and Connecticut law as an employee of a retail or service establishment

The plaintiff seeks blanket summary judgment as to the plaintiff's status as an exempt employee, based on an analysis under the bona fide administrative exemption under FLSA. However, in her motion and accompanying memorandum, the plaintiff

provides little to no analysis as to whether she is properly designated as exempt as an appropriate commissioned employee of a retail or service establishment. The weight of the evidence available at the present shows that the plaintiff, in addition to being a bona fide administrative employee, also qualified as a commission-based sales person under both 29 U.S.C. §207(i) and Connecticut General Statutes §31-76i(g).

Under both Federal and Connecticut state law, an employee, employed by a retail or service establishment is exempt from overtime requirements if "(1) the regular rate of pay of such employee is in excess of one and one-half times the minimum hourly rate applicable to him under section 6 [29 USCS § 206][2], and (2) more than half his compensation for a representative period (not less than one month) represents commissions on goods or services. 29 USCS § 207(i).

As a threshold issue, it must be determined if NEP qualified as a retail or service establishment. At the outset, it should be noted that the plaintiff has not advanced any evidence that would exclude NEP from being classified as such. Moreover, the evidence that does exist shows that under FLSA's framework that NEP does qualify as a service establishment.

Under FLSA, A retail or service establishment means "an establishment 75 per centum of whose annual dollar volume of sales of goods or services (or of both) is not

---

[2] (A)  $ 5.85 an hour, beginning on the 60th day after the date of enactment of the Fair Minimum Wage Act of 2007 [enacted May 25, 2007];(B)  $ 6.55 an hour, beginning 12 months after that 60th day; and (C)  $ 7.25 an hour, beginning 24 months after that 60th day;

for resale and is recognized as retail sales or services in the particular industry." 29 C.F.R. § 779.332. The regulations further define a retail or service establishment as:

> one which sells goods or services to the general public. It serves the everyday needs of the community in which it is located. The retail or service establishment performs a function in the business organization of the Nation which is at the very end of the stream of distribution, disposing in small quantities of the products and skills of such organization and does not take part in the manufacturing process.

29 C.F.R. § 779.318(a). Based on all available evidence NEP acted exclusively as a personnel recruiter which provided end of the line services that in no way implicated the manufacturing process. *See e.g.* Pl. Compl. At ¶6. Given that NEP qualifies as a service establishment, it is next necessary to evaluate the position that the plaintiff filled.

The terms of the plaintiff's employment with NEP satisfy both criteria for qualifying as an exempt employee under FLSA.  Though paid an annual salary, the plaintiff's hourly compensation was figured, based on a forty-hour week to be $22.84 per hour. Pl. Ex. 7 at p. 1. Even at the highest minimum wage level, this constitutes approximately 3.15 times the applicable minimum wage.[3]  Similarly under Connecticut law, a worker must make twice the amount of the applicable Connecticut minimum wage[4] in order to qualify for this exemption – a threshold which the plaintiff meets. *See* Conn. Gen. Stat. §31-76i(g).

---

[3] Even if the plaintiff had worked an average of 80 hours per week, which the plaintiff herself does not even allege, her hourly rate would still exceed one and on-half times the minimum hourly rate applicable to her.

[4] effective January 1, 2010, not less than eight dollars and twenty-five cents per hour, and effective January 1, 2014, not less than eight dollars and seventy cents per hour, and effective January 1, 2015, not less than nine dollars and fifteen cents per hour Conn. Gen. Stat. § 31-58

In addition to a sufficiently high hourly rate, the plaintiff also derived more than half of her effective income from commissions while working for the defendants. At the deposition of Kathryn Melanson, she testified as to the creation of the commission tracking statement for the plaintiff, which had been produced in response to the plaintiff's requests for production. Exhibit A, Tr. 9:9-11:6. The statement covers a period of twenty-one months between June 1, 2012 and February 27, 2014. Def. Ex. B. During that twenty-one month period, the plaintiff was paid commissions totaling at least $121,961.90. *Id* at p.2. On an annualized rate, this amounts to commissions of $69,692.51. Therefore, the plaintiff's commissions, over almost two years, comprised over half of her total annual compensation of $116,692.50, when added to her annual salary of $47,000.

Connecticut law imposes an additional requirement that the employee in question work no more than fifty-five hours in a week. Conn. Gen. Stat. §31-76i(g)(3). At no point has the plaintiff alleged that she has worked over that number of hours in a week, and the most that she has ever alleged was 48.5 hours in a given week. Def. Ex. C at pp. 10-13 (Deposition Exhibit 7).

Because the plaintiff made more than one and one-half times (two times under Connecticut law) the applicable minimum wage, and because more than half of her six-figure income came from commissions, the plaintiff was properly categorized as an exempt employee under FLSA. Additionally, because she has never claimed to have worked more than 55 hour weeks, her claim must also fail under Connecticut law. As such, her motion for summary judgment on this ground should be denied.

**V.   SUMMARY JUDGMENT IS INAPPROPRIATE AS TO THE OTHER ASPECTS OF THE PLAINTIFF'S CLAIMS THE DEFENDANTS' DEFENSES**

> **A. Plaintiff was an exempt employee under the administrative exemption pursuant to Connecticut State labor law**

As the plaintiff correctly identifies in her motion for summary judgment, "interpretation of the Connecticut exemption is aided by federal precedent respecting the meaning and scope of the analogous federal exemption. . . . Also worthy of note are certain of the federal regulations that are designed to provide 'guiding principles for determining whether an employee's employment and compensation meet the conditions' set forth in [the FLSA]. *Roto-Rooter Services Co. v. Department of Labor,* 219 Conn. 520, 528 n.8 (1991).

Therefore, based on the foregoing discussion of the plaintiff's status as an exempt employee under FLSA from Section IV.B, she must also be considered to be exempt under Connecticut State law.

> **B. Thomas Melanson was not an "employer" for the purposes of the plaintiff's wage claims under FLSA and Connecticut Law**

Based on a serious disability, coinciding with the plaintiff's employment with NEP, Thomas Melanson was not an "employer" of the plaintiff during her tenure there. Under FLSA an "employer" is "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. §203(d).  Whether a specific individual is an employer under FLSA is typically determined under an economic reality test which takes into account whether the individual "(1) had the power to hire and fire the employees; (2) supervised and controlled employee work schedules or conditions of

employment; (3) determined the rate and method of payment; and (4) maintained employment records." *Herman*, 172 F.3d at 139.

Under the economic reality test, Thomas Melanson was not an employer for the purposes of FLSA. First of all, Kathryn Melanson testified that during the time that the plaintiff worked for NEP, that Ms. Melanson was the person with sole power to hire and fire personnel from NEP. Exhibit A, Tr. 19:1-20:8. However, the more important evidence is that Thomas Melanson was not capable of performing any of the functions envisioned by the economic reality test. As Kathryn Melanson testified, Thomas Melanson had no involvement with the business during the plaintiff's employment with NEP "because in between 2008 and 2010 Tom had seven strokes. In 2010, he had an esophagectomy which went on too long, resulted in a major stroke. So he's incapable. Exhibit A, Tr. 116:25-117:13.

While the plaintiff characterizes this testimony as the sort of "scintilla" of evidence that the Supreme Court has stated in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) cannot prevent summary judgment, this is clearly not the case. Although the plaintiff has pointed to specific instances where she claims to have interacted with Thomas Melanson and represents the extent to which he was involved, the evidence set forth by the defendants directly contradicts the extent of his involvement. The testimony as to the severe medical conditions suffered by Thomas Melanson calls into question whether the level of involvement, described by the plaintiff was even possible. An individual who has suffered seven strokes, culminating in a massive stroke over the course of two years is unlikely to be as involved in the running of a business as the plaintiff describes.

As such, a genuine issue of material fact exists as to whether Thomas Melanson was an "employer" at NEP for the purposes of FLSA during the tenure of the plaintiff. Such issues are properly left to a finder of fact.

### C.  The applicable FLSA statute of limitations is two years

Based on the record before the Court, summary judgment should not enter, declaring the statute of limitations applicable to the present situation to be three years. Under FLSA, the applicable statute of limitations two years unless the "cause of action aris[es] out of a willful violation. 29 U.S.C. §255(a). In order for a plaintiff to sustain a case beyond the two year statute of limitations, it must be shown "that the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *Herman v. RSR Sec. Services Ltd.*, 172 F.3d 132, 141 (2d Cir. 1999)(*quoting McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988). Whether an employer willfully violated FLSA is an issue typically left to the trier of fact. *Matysiak v. Shamas*, No. 3:10-cv-01841-GWC, 2015 U.S. Dist. LEXIS 108384, at *14 (D. Conn. Aug. 17, 2015)(*citing Ramirez v. Rifkin*, 568 F. Supp. 2d 262, 268 (E.D.N.Y. 2008).

Here, not only is the record bereft of any evidence indicating reckless disregard for compliance with overtime requirements under FLSA, but there is ample evidence of the defendants' good faith efforts to comply with the applicable law. In response to questioning as to how to classify the plaintiff's position as exempt, Ms. Melanson testified that the defendants had been:

> very involved with labor law from the standpoint of being constantly updated by various Internet research that we do.  At one time we were heavily involved with the National Association of Personnel Consultants, both on a national level as well as a state level, and they're continuously

keeping you updated with items of these matters.  In addition to the fact we are an employment placement firm; therefore, we're always being provided information by many of our clients as to all this information.

Exhibit A, Tr. 96:24-97:9. The plaintiff faults the defendants for not seeking an opinion from the U.S. Department of Labor or the Connecticut Department of Labor. However, the plaintiff cites no law requiring the defendants to do so. The defendants made reasonable inquiries to ascertain that it was legal to classify recruiters generally, and the plaintiff specifically, as exempt employees.

In addition to the efforts taken by the defendants, their position is bolstered by the fact that the plaintiff was correctly classified as an exempt employee.  As discussed previously in Sections IV.B and IV.C respectively, the plaintiff's position with NEP was correctly categorized as exempt both as an administrative employee under 29 USC. §213(a)(1); and Connecticut General Statutes §31-76i(e) and as an external sales person under 29 USC. §213(a)(1); and Connecticut General Statutes §31-76i(g).

The discussions in these preceding sections address the plaintiff's blanket claim that no evidence exists that shows that the plaintiff ever made sales on behalf of the defendants. However, in this section, the plaintiff specifically raises the point that FLSA and the Connecticut General Statutes make a distinction between "work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." 29 C.F.R. §201(a)  However the defendants argue that the plaintiff was alternatively exempt because she received commissions as the primary portion of her salary from a

service establishment akin to an outside salesman whose work is exempt under 29 USC. §207(i); and Connecticut General Statutes §31-76i(g). As discussed previously in Section IV.C , the facts and the law exempt the plaintiff from overtime pay as a sales person for a service establishment in addition to as an administrative employee.

Therefore, the fact that the defendants undertook an investigation into whether to classify recruiters as exempt, combined with the merits of such a designation make summary judgment on the issue of willfulness under 29 U.S.C. §255(a) inappropriate.

### D. Plaintiff is not entitled to double damages under either FLSA or Conn. Gen. Stat. §31-72

As previously discussed in sections IV.B and IV.C, the plaintiff was an exempt employee during her employment for NEP and as such was not entitled to overtime payments. Therefore, there are no grounds on which the plaintiff can be entitled to double damages under either FLSA or Connecticut General Statutes §31-72, since a finding of liability for failure to pay overtime wages is a prerequisite to a finding of double damages. 29 U.S.C. §216(b); Conn. Gen. Stat §31-72.

The previously discussed evidence, indicating that the plaintiff was exempt means that the defendants' designations of her position was manifestly reasonable. Moreover, not only were sources available to the defendants, but Ms. Melanson testified that she was active in keeping apprised of labor developments and standards. Based on the defendants' diligence to keep apprised of the laws and the ultimate reality of the plaintiff's job with NEP, this

honorable Court should not grant the plaintiff summary judgment as to her claim for double damages.

## VI.   CONCLUSION

Based on the foregoing, the defendants respectfully request that this honorable Court deny the plaintiff's motion for summary judgment as to all counts.

Respectfully submitted,

New England Personnel, et al

/s/ Evan K. Buchberger
Bruce H. Raymond ct04981
Evan K. Buchberger ct29973
Shafer Glazer, LLP
90 National Drive, Suite 3
Glastonbury, CT 06033
braymond@shaferglazer.com
ebuchberger@shaferglazer.com
Phone: 860-633-0580
Fax: 860-633-0438

Attorneys for Defendant

**Certificate of Service**

I hereby certify that on March 21, 2017, a copy of foregoing was served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.


/s/ Evan K. Buchberger
Evan K. Buchberger

## *2005 DOLWH LEXIS 59*

U.S. Department of Labor Employment Standards Administration Wage and Hour Division Washington, D.c. 20210
U.S. Department of Labor, Employment Standards Administration, Wage and Hour Division, Washington, D.C. 20210

**Reporter**
2005 DOLWH LEXIS 59 *

# FLSA2005-45

October 25, 2005

## Core Terms

staffing, exempt, primary duty, independent judgment, general business, final rule, personnel, placement

**Panel:** Alfred B. Robinson, Jr., Deputy Administrator

## Opinion

 **[*1]**
Dear **Name** *,*

This is in response to your letter requesting an opinion concerning whether Staffing Managers employed by your client, Company X, qualify for the executive or administrative exemption under section 13(a)(1) of the Fair Labor Standards Act (FLSA). You seek this opinion in light of the final rules at 29 C.F.R. Part 541 implementing minimum wage and overtime pay exemption that went into effect on August 23, 2004.

Section 13(a)(1) of the FLSA provides a complete minimum wage and overtime pay exemption for any employee employed in a bona fide executive, administrative, or professional capacity, as those terms are defined in 29 C.F.R. Part 541. An employee may qualify for exemption if all of the pertinent tests relating to duty, salary level and salary basis, as discussed in the appropriate section of the regulations, are met. Please note that revisions **[*2]** to 29 C.F.R. Part 541 were published as a final rule in the *Federal Register* on April 23, 2004 *(69 Fed. Reg. 22122)* and became effective on August 23, 2004 (copy enclosed).

You state that Company X is a temporary staffing agency. It provides temporary labor in various clerical, accounting, human resource, computer and similar white collar functions to clients who have a need for such personnel. The primary duty of a Staffing Manager is to manage this function. In doing so, a Staffing Manager confers with the client to evaluate what kind of skills are needed: for example, will a certified public accountant be necessary, or will someone with basic accounting and bookkeeping skills fulfill the services required. Once a job description is decided, the Staffing Manager negotiates the terms for the placement and the fee for Company X. Thereafter, the Staffing Manager recruits, interviews and hires the employee to provide the services. In recruiting and selecting employees to fill assignments, Staffing Managers do not simply check off a few minimal requirements, but must evaluate the potential worker's education, skills acquired in prior employment, personality **[*3]** fit and ability to work within a particular organization. Staffing Managers then make recommendations to the client companies for placement of employees at particular assignments. The Staffing Managers' recommendations are typically followed. Staffing Managers also negotiate the wage to be paid by Company X to the employee. Once the

---

*  Note: The actual name(s) was removed to preserve privacy in accordance with 5 U.S.C. 552 (b)(7).

employee is placed, the Staffing Manager continues to supervise the services of the employee with the client. The Staffing Manager stays in contact with the client and the employee to evaluate the employee's performance. As the situation calls for, the Staffing Manager decides whether counseling or disciplining an employee is necessary. If the employee fails to respond to counseling or discipline, the Staffing Manager may decide to transfer the employee to another placement, or if necessary, terminate his or her employment with Company X. Staffing Managers typically supervise about thirty employees. Staffing Managers have full authority to discipline, fire, promote and assign to various tasks the employees they supervise. Although the employees of Company X report to a supervisor at the client location for the details of their work, they report to the **[\*4]** Staffing Manager for matters relating to length of assignment; position held; performance issues; complaint and grievance issues; counseling; discipline; pay adjustments and termination of employment. In carrying these duties, Staffing Managers work under very little supervision; they make decisions and accomplish their tasks without prior approval and with broad range of discretion.

In addition, Staffing Managers decide if advertising for the position is needed to find certain candidates. They determine where to place the advertisement and negotiate the costs of such placement. Staffing Managers are paid at least $ 455 per week on a salary basis.

As discussed in *29 C.F.R. § 541.200(a)*, the term "employee employed in a bona fide administrative capacity" in section 13(a)(1) of the FLSA means "any employee":

1) Compensated on a salary or fee basis of at least $ 455 per week … ;

2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and

3) Whose primary duty includes the exercise of discretion and independent judgment **[\*5]** with respect to matters of significance.

*Id.* "The phrase 'directly related to management or general business operations' refers to the type of work performed by the employee. To meet this requirement, an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." *29 C.F.R. § 541.201(a)*.

"Work directly related to management or general business operations includes, but is not limited to, work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations; government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities." *29 C.F.R. § 541.201(b)*.

"An employee may qualify for the administrative exemption if the employee's primary duty is the **[\*6]** performance of work directly related to the management or general business operations of the employer's customers. Thus, for example, employees acting as advisers or consultants to their employer's clients or customers (as tax experts or financial consultants, for example) may be exempt." *29 C.F.R. § 541.201(c)*.

"To qualify for the administrative exemption, an employee's primary duty must include the exercise of discretion and independent judgment with respect to matters of significance. In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered. The term 'matters of significance' refers to the level of importance or consequence of the work performed." *29 C.F.R. § 541.202(a)*.

"The phrase 'discretion and independent judgment' must be applied in the light of all the facts involved in the particular employment situation in which the question arises. Factors to consider when determining whether an employee exercises discretion and independent **[\*7]** judgment with respect to matters of significance include, but are not limited to: whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if

the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances." *29 C.F.R. § 541.202(b)* [*8] .

As the preamble to the final rule explained, *69 Fed. Reg. 22122, 22143* (April 23, 2004) (copy enclosed), federal courts generally find that employees who meet at least two or three of these factors mentioned above are exercising discretion and independent judgment, although a case-by-case analysis is required.

In performing the Staffing Managers' primary duty of recruiting, hiring and managing the temporary labor pool of Company X's clients, the Staffing Managers perform work in the functional areas of personnel management, human resources and labor relations. See *29 C.F.R. § 541.201(b)*. Thus, it appears that the Staffing Managers' primary duty meets the requirement that such office or non-manual work be directly related to the management or general business operations of the employer's clients.

Whether a Staffing Manager exercises discretion and independent judgment within the meaning of the regulations would depend, to a great extent, on the amount of selectivity exercised in matching persons seeking employment with the requirements of the job opening and in deciding which employee to send to any particular [*9] employer for consideration, as opposed to referring to the employer several prospects who generally meet the qualifications for the job. See WH Opinion Letters dated August 11, 1970 and October 14, 1983 (copies enclosed). It appears that Staffing Managers who recruit; interview; hire and recommend placement of employees to particular assignments; manage the client's temporary labor pool; provide advice on personnel issues; handle complaints; resolve grievances; and terminate employees on behalf of the client's management, exercise the requisite discretion and independent judgment with respect to matters of significance. See *29 C.F.R. § 541.202(b)*. The final rule identifies human resources managers, who perform similar duties interpreting and implementing employment policies, as exempt and it distinguishes as nonexempt those personnel clerks who simply screen applicants to obtain data regarding qualifications and to identify those who do not meet the minimum required standards. See *29 C.F.R. § 541.203(e)*.

Based on analysis of the information provided, it is our opinion that Staffing Managers employed [*10] by Company X qualify for the administrative exemption under the final rule at *29 C.F.R. § 541.200*. We are unable to make a determination regarding the applicability of the executive exemption to Staffing Managers in this case, because there is insufficient information as to whether the Staffing Managers' primary duty is management of a customarily recognized department or subdivision with a permanent status and a continuing function, or a mere collection of employees assigned from time to time to a specific job or series of jobs. See *29 C.F.R. § 541.103(a)*.

This opinion is based exclusively on the facts and circumstances described in your request and is given based on your representation, express or implied, that you have provided a full and fair description of all the facts and circumstances that would be pertinent to our consideration of the question presented. Existence of any other factual or historical background not contained in your letter might require a conclusion different from the one expressed herein. You have represented that this opinion is not sought by a party to pending private litigation [*11] concerning the issue addressed herein. You have also represented that this opinion is not sought in connection with an investigation or litigation between a client or firm and the Wage and Hour Division or the Department of Labor. This opinion is issued as an official ruling of the Wage and Hour Division for purposes of the Portal-to-Portal Act, *29 U.S.C. § 259*. See *29 C.F.R. §§ 790.17(d)*, *790.19*; *Hultgren v. County of Lancaster, 913 F.2d 498, 507 (8th Cir. 1990).*

We trust that this letter is responsive to your inquiry.

Sincerely,

Enclosures:

29 C.F.R. Part 541

69                              Fed.                              Reg.                              22143

WH Opinion Letters dated August 11, 1970 and October 14, 1983

**Load Date:** 2014-06-28

---

End of Document

## *2000 DOLWH LEXIS 10*

U.S. Department of Labor

**Reporter**
2000 DOLWH LEXIS 10 *

# [NO NUMBER IN ORIGINAL]

December 8, 2000

## Core Terms

independent judgment, generalist, recruiter, analyst, salary, personnel, exempt, bona fide, new hire, administrative employee, exercise of discretion, exercise discretion, management policy, general business, work directly, nonmanual, recommend

**Panel:** Barbara R. Relerford, Office of Enforcement Policy, Fair Labor Standards Team

## Opinion

 **[*1]**
Dear

This is in response to your letter requesting an opinion concerning the application of the Fair Labor Standards Act (FLSA) to HR generalists/analysts and university technical recruiters employed in the [TEXT REDACTED BY THE COURT.]

The position descriptions indicate that both the HR generalist/analyst and the university technical recruiter recruit, screen, test and interview applicants for employment; participate in college career/job fairs; research, develop, implement, and coordinate procedures for personnel processes and policies; make personnel recommendations to hiring managers; monitor and maintain files, computer reports, and manuals; conduct and analyze salary survey data for applicable managers; create and place media advertisements; process new hire paperwork and assist in new hire orientation, process personnel status reports (regarding new hires, promotions, transfers, salary adjustments, separations, and other employee actions). Additionally, the university technical recruiter administers the Intern, Co-op, and Leadership Development Programs; and the HR generalist/analyst assists in grievance resolution; conducts research on personnel issues (including EEO **[*2]** and affirmative action goals) and makes appropriate recommendations; and acts as a liaison with consulting firms.

Section 13(a)(1) of the FLSA provides a complete minimum wage and overtime pay exemption for any employee employed in a bona fide executive, administrative, professional, or outside sales capacity, as those terms are defined in Regulations, 29 CFR Part 541, copy enclosed. An employee may qualify for exemption if all the pertinent tests relating to duties, responsibilities and salary, as discussed in the appropriate sections of the regulations, are met. Although your letter does not contain sufficient information for us to make a definite determination concerning the application of section 541.2 to the employment in question, the following information may be of assistance to you.

An employee who is paid on a salary or fee basis of at least $ 250 per week may qualify for exemption as a bona fide administrative employee if the employee has as his/her primary duty office or nonmanual work directly related to management policies or general business operations of his/her employer or his/her employer's customers, which includes work requiring the customary and regular exercise **[*3]** of discretion and independent judgment. It is clear from the position descriptions that the HR generalist/analyst and the university technical recruiter are engaged in

2000 DOLWH LEXIS 10, *3

office or nonmanual work directly related to management policies or general business operations of his/her employer. However, the question remains as to whether these individuals are exercising the necessary discretion and independent judgment within the meaning of the regulations.

In accordance with section 541.207, the exercise of discretion and independent judgment, in general, involves the comparison and the evaluation of possible courses of conduct and acting or making a decision after various possibilities have been considered. The term as used in the regulations implies that the person has the independent choice free from immediate direction or supervision and with respect to matters of significance. An employee who merely applies his/her knowledge in following prescribed procedures or determining which procedure to follow, or who determines whether specified standards are met or whether an object falls into one or another of a number of definite grades, classes, or other categories, with or without the use **[*4]** of testing or measuring devices, is not exercising discretion and independent judgment within the meaning of section 541.2, even if there is some lee-way in reaching a conclusion.

Whether the HR generalist/analyst or the university technical recruiter exercise discretion and independent judgment within the meaning of the regulations would depend, to a great extent, on the amount of selectivity exercised in matching persons seeking employment with the requirements of the job openings and in deciding which employee to send or refer for consideration for a job, as opposed to referring several prospects who generally meet the qualifications of the job. Whether the selectivity exercised by the HR generalist/analyst and the university technical recruiter in referring individuals for jobs requires the necessary exercise of discretion and independent judgment required for exemption as a bona fide administrative employee would depend on all the facts in the specific employment situation, and cannot be determined exclusively upon a job title or job description.

Finally, your letter does not provide information concerning whether the salary test is met. In this regard, see sections 541.2(e) **[*5]** and 541.118.

We hope the above information will be of assistance to you. If you have further questions, please do not hesitate to contact us.

Sincerely,

**Load Date:** 2014-06-28

---

End of Document

**A** Neutral
As of: March 21, 2017 12:16 PM EDT

# *Matysiak v. Shamas*

United States District Court for the District of Connecticut

August 17, 2015, Decided; August 17, 2015, Filed

Case No. 3:10-cv-01841-GWC

**Reporter**
2015 U.S. Dist. LEXIS 108384 *; 2015 WL 4939793

ZBIGNIEW MATYSIAK, Plaintiff, v. MATTHEW M. SHAMAS and SPECTRUM SERVICES COMPANY INC., Defendants.

**Prior History:** *Matysiak v. Spectrum Servs. Co., 2014 U.S. Dist. LEXIS 16461 (D. Conn., Feb. 10, 2014)*

## Core Terms

prevailing wage, independent contractor, asserting, overtime, partial summary judgment, statute of limitations, summary judgment, employees, alleges, equitable tolling, willful violation, Defendants', equitably, summary judgment motion, cause of action, denies, notice, parties, paint, public works project, overtime pay, green card, two year, misrepresentation, permanent, estopped, estoppel, accrued, applies, unpaid

**Counsel:** **[*1]** For Zbigniew Matysiak, Plaintiff, Counter Defendant: Mariusz Kurzyna, LEAD ATTORNEY, The Law Office of Mariusz Kurzyna, New Britain, CT.

For Matthew M. Shamas, Spectrum Services Company Inc, Defendants: Lisa A. Zaccardelli, LEAD ATTORNEY, Hinckley Allen Snyder LLP-Htfd, Hartford, CT.

For Spectrum Services Company Inc, Counter Claimant: Lisa A. Zaccardelli, LEAD ATTORNEY, Hinckley Allen Snyder LLP-Htfd, Hartford, CT.

**Judges:** Geoffrey W. Crawford, United States District Judge.

**Opinion by:** Geoffrey W. Crawford

## Opinion

**OPINION AND ORDER RE: DEFENDANTS' AND PLAINTIFF'S MOTIONS FOR SUMMARY JUDGMENT**

**(Docs. 101 & 106)**

Plaintiff Zbigniew Matysiak brings this action against his former employer, Spectrum Services Company, Inc., and its owner, Matthew M. Shamas, to recover wages that defendants allegedly failed to pay him over an eight-year period when he worked for Spectrum as a painter. Matysiak alleges violations of the overtime wage provisions of the Fair Labor Standards Act (FLSA), *29 U.S.C. §§ 201-219* as well as the Connecticut Minimum Wage Act (CMWA), *Conn. Gen. Stat. §§ 31-53*; 31-76c. Defendants filed counterclaims for breach of contract and breach of the implied warranty of good faith and fair dealing, claiming that Matysiak's lawsuit violates a settlement contract **[*2]** previously reached by the parties.

Defendants have filed a motion for partial summary judgment asserting that under both the FLSA and the CMWA, Matysiak may only recover damages for the two years prior to the date he filed his lawsuit. Matysiak has filed his own motion for partial summary judgment seeking a declaration that he was an employee—rather than an independent contractor—when he worked for defendants, and that defendants are therefore liable for their admitted nonpayment of overtime.

### I. Facts

The following facts are drawn from the parties' statements of material facts and are undisputed except where noted.

Spectrum is a painting contractor that works on private and public construction projects. Matthew Shamas is Spectrum's president. Spectrum currently employs approximately nine employees and nine independent contractors. It employed a similar number when Matysiak worked there. (Doc. 119 at 1.)

Matysiak worked for Spectrum from March 2001 to

September 2009. He claims that he was an employee. He denies working for anyone else during this period. He was paid by the hour. He received a paycheck each Wednesday for work performed the previous week, on the same schedule as workers whom **[*3]** Spectrum identifies as "employees." (Doc. 113 at 5.) He maintains that he received the same level of supervision as any other worker. He says that he worked "a set schedule" from 7:00 a.m. to 3:30 p.m., Monday through Friday, with a half-hour break at noon for lunch. He often worked past 3:30 p.m. or on the weekends, but only when he was instructed to do so by the Spectrum superintendent. He was required to fill out and submit a weekly timesheet at the end of each workweek. (Doc. 107 at 2-3.)

Matysiak claims that he frequently worked more than forty hours per week and was never paid overtime. (*Id.* at 2.) Defendants admit that Matysiak did not receive overtime pay, but deny that he was entitled to it. (Doc. 63 ¶ 26.)

Spectrum maintains that Matysiak was an independent contractor. Spectrum reported Matysiak's income to the IRS on a 1099 form. Spectrum alleges that it hired Matysiak to paint, but did not dictate how he should perform the work. Spectrum alleges that Matysiak was free to work for other companies while providing services to Spectrum on a contract basis. Spectrum alleges that Matysiak was not subject to discipline by Spectrum, not required to attend company meetings, and not required **[*4]** to take breaks during the workday. Spectrum further maintains that Matysiak used his own tools and supplies. (Doc. 119 at 2-3.)

Matysiak admits that he purchased his own paintbrushes while working for Spectrum, but denies providing other equipment. Matysiak filed tax returns while working for Spectrum which stated that he was self-employed. He took deductions for purchasing his own painting equipment and supplies. He also secured his own worker's compensation and liability insurance naming himself as the insured. His 2009 tax return includes a deduction for the purchase of this insurance. He also took thousands of dollars in vehicle deductions. (*Id.* at 3-4.)

Matysiak was not authorized to work in the United States from 2000 to 2009. In 2009, he became a permanent resident. Defendants maintain that they always believed that Matysiak was a documented worker, and that he showed them documents indicating he could work legally in the United States. Matysiak

denies this, stating that he only showed them a certificate of insurance in 2008 and his permanent resident card in 2009, and that defendants knew he was undocumented prior to then. (Doc. 119 at 4-5.)

The CMWA requires that workers he paid a "prevailing **[*5]** wage" if working on certain public projects. *Conn. Gen. Stat. § 31-53*. This rate was typically one-and-a-half to two times the rate that Spectrum paid Matysiak. (Doc. 53 ¶¶ 18-34.) Matysiak maintains that Spectrum did not pay him the prevailing wage when he worked on such projects. (*Id.*) Spectrum maintains that it only employed Matysiak on private projects, and that it generally does not employ independent contractors on prevailing wage jobs. (Doc. 119 at 6-7.) According to Spectrum, due to an error, Matysiak worked on a prevailing wage project on a single occasion for one or two days sometime prior to 2007. (*Id.*)

Matysiak alleges that "[a]t various times throughout my employment, I asked Matthew Shamas to pay me prevailing wages on public works projects. Each time, Shamas responded that he could not do so while I was undocumented but would pay me prevailing wages as soon as I got my green card." (Doc. 119-1 ¶¶ 14-15.)

In his complaint, Matysiak asserted claims under the overtime pay provision in the FLSA, *29 U.S.C. § 207*, the overtime pay provision in *Conn. Gen. Stat. § 31-76c*, the prevailing wage provision of *Conn. Gen. Stat. § 31-53*, and the Connecticut Unfair Trade Practices Act, *Conn. Gen. Stat. § 42-110g*. This court previously dismissed Matysiak's CUTPA claim for failure to state a claim. (Doc. **[*6]** 62.)

## II. Analysis

### A. Summary Judgment Standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. In considering a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*.

### B. Defendants' Motion for Partial Summary Judgment on Statute of Limitations Defense

Defendants seek partial summary judgment in their

favor, arguing that Matysiak is barred by the FLSA and its Connecticut counterpart from recovering more than two years' worth of damages. (Doc. 106.)

An action for unpaid overtime compensation under the FLSA must be brought within two years after the cause of action accrued, "except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued." *29 U.S.C. § 255(a)*. Similarly, an action for unpaid wages or overtime brought under the CMWA must be brought within two years after the cause of action accrues. *Conn. Gen. Stat. § 52-596*. The limitations period is tolled upon the filing of a complaint with the Labor **[*7]** Commissioner, *see id.*, but no such claim was filed in this case. (Doc. 119 at 8.)

An action under the FLSA for unpaid overtime accrues "when the employer fails to pay the required compensation for any workweek at the regular pay day for the period in which the workweek ends," *29 C.F.R. § 790.21*. The court predicts that this rule applies to claims under Connecticut law as well. *See Powanda v. Inteplast Grp., Ltd., L.P., No. 3:14cv846, 2015 U.S. Dist. LEXIS 87099, 2015 WL 4078117, at *2 (D. Conn. July 6, 2015)* (predicting that Connecticut Supreme Court would allow plaintiff to pursue wage claims under Connecticut law for two-year period prior to filing of his complaint). Matysiak filed suit on November 24, 2010. Under the plain language of the statutes, then, he may seek recovery for unpaid wages for two years prior to that date under the CMWA, and up to three years prior to that date under the FLSA if he can prove that a willful violation occurred.

### i. Whether Equitable Tolling Applies to Matysiak's Claims

Matysiak argues that the limitations period should be equitably tolled because defendants failed to post statutorily required notices in violation of *29 C.F.R. § 516.4*, and because defendant Shamas told Matysiak that he could not legally pay him prevailing wages until he got his green card.

"Equitable **[*8]** tolling allows courts to extend the statute of limitations beyond the time of expiration as necessary to avoid inequitable circumstances," *Johnson v. Nyack Hosp., 86 F.3d 8, 12 (2d Cir. 1996)*. It is "an extraordinary measure that applies only when plaintiff is prevented from filing despite exercising that level of diligence which could reasonably be expected in the circumstances." *Veltri v. Bldg. Serv. 32B-J Pension*

*Fund, 393 F.3d 318, 322 (2d Cir. 2004)*; *see also Wallace v. Kato, 549 U.S. 384, 396, 127 S. Ct. 1091, 166 L. Ed. 2d 973 (2007)* ("Equitable tolling is a rare remedy to be applied in unusual circumstances, not a cure-all for an entirely common state of affairs."). Under the doctrine of equitable tolling, the statute of limitations "does not begin to run until the plaintiff either acquires actual knowledge of the facts that comprise his cause of action or should have acquired such knowledge through the exercise of reasonable diligence after being apprised of sufficient facts to put him on notice." *Cerbone v. Int'l Ladies' Garment Workers' Union, 768 F.2d 45, 48 (2d Cir. 1985)* (quotation omitted). Courts have applied equitable tolling where it would have been impossible for the plaintiff to learn of the cause of action, or where the defendant concealed the cause of action. *Bowers v. Transportacion Maritima Mexicana, S. A., 901 F.2d 258, 264 (2d Cir. 1990)*; *Miller v. Int'l Tel. & Tel. Corp., 755 F.2d 20, 24 (2d Cir. 1985)*.

Matysiak asserts in an affidavit filed in response to defendants' motion for summary judgment that "[d]uring my employment on public works projects, Spectrum did **[*9]** not post and keep posted in a prominent place at the job site a notice stating that persons performing work on the project are covered by the prevailing wage or a notice listing the relevant prevailing wages as determined by the Labor Commissioner." (Doc. 119-1 at 2.)

Accepting Matysiak's statement as true, it does not support application of the equitable tolling doctrine. Failure to post required wage-and-hour notices is insufficient to toll the FLSA statute of limitations. *See Upadhyay v. Sethi, 848 F. Supp. 2d 439, 445 (S.D.N.Y. 2012)* (holding that failure to post required FLSA notices "is not by itself sufficient to warrant equitable tolling; plaintiff must also show that she had not received notice of her rights through any other avenue"). Matysiak has not cited any Connecticut case establishing a more stringent rule under the CMWA. From Matysiak's own assertions, it is clear that he believed he was being underpaid the entire time that he worked for defendants. He says that he "repeatedly" asked defendant Shamas to pay him the prevailing wage. He therefore knew the facts that could support his claim, even if he did not know that he had a cause of action under the FLSA or Connecticut law. *Gustafson v. Bell Atl. Corp., 171 F. Supp. 2d 311, 323 (S.D.N.Y. 2001)* (declining to apply equitable tolling because it **[*10]** was "clear that plaintiff knew the facts that would comprise a cause of action under either the FLSA or New York law (that he was receiving straight pay for overtime) even if he did not

know that he had a legal claim under those statutes.").

## ii. Whether Defendants Are Equitably Estopped from Asserting the Statute of Limitations

Matysiak further argues that defendants should be equitably estopped from applying the statute of limitations because defendants told Matysiak that they could not pay him prevailing wages on public works projects while he was undocumented but would do so once he got his green card. There was no basis for this assertion on the part of defendants. The legal rate of pay for a worker does not depend upon his or her immigration status. *See* *Conn. Gen. Stat. § 31-53* (stating that prevailing wages must be paid to "*any* mechanic, laborer or worker" on qualifying public works projects (emphasis added)); *see also* *Flores v. Amigon, 233 F. Supp. 2d 462, 463 (E.D.N.Y. 2002)* ("[A]ll employees, regardless of their immigration status, are protected by the provisions of the FLSA.").

"[Equitable] estoppel arises if (i) the defendant made a definite misrepresentation of fact, and had reason to believe that the plaintiff would rely on it; and (ii) the plaintiff reasonably **[*11]** relied on that misrepresentation to his detriment." *Kavowras v. N. Y. Times Co., 328 F.3d 50, 56 (2d Cir. 2003)* (quotations omitted); *Conn. Nat'l Bank v. Voog, 233 Conn. 352, 659 A.2d 172, 179 (Conn. 1995)*. A defendant may be equitably estopped from asserting the statute of limitations where the plaintiff knew he had a cause of action but the defendant's misconduct caused the plaintiff to delay filing suit. *Buttry v. Gen. Signal Corp., 68 F.3d 1488, 1493 (2d Cir. 1995)*.

Matysiak alleges that defendants provided him with false reasons why they could not pay him prevailing wages while holding out the promise that they would do so once he became a lawful permanent resident, thereby causing him to delay bringing this action. (Doc. 118 at 8.) Matysiak further alleges that when he became a lawful permanent resident on August 6, 2009, he showed Shamas his "green card" and demanded the promised prevailing wage, but Shamas instead terminated him on September 25, 2009. (Doc, 119-1 at 3.)

The court accepts as true for the purposes of summary judgment the assertion that defendant Shamas orally misrepresented to Matysiak that he would be paid prevailing wages on public works projects once he received his green card, Matysiak asserts that Shamas repeated this misrepresentation to him multiple times

over the years. He says that each time he asked Shamas to pay him prevailing wages, Shamas **[*12]** increased his hourly rate by one or two dollars an hour. (Doc. 102-4 at 24-25.) Matysiak alleges in his complaint that his hourly pay was increased in 2003, 2004, 2005, and twice in 2007, Accepting Matysiak's assertion that Shamas raised his pay every time he demanded the prevailing wage, this means that Matysiak was aware that he was being underpaid as early as 2003 and that Shamas's alleged misrepresentations began around that time.

"It is fundamental that a person who claims an estoppel must show that he has exercised due diligence to know the truth, and that he not only did not know the true state of things but also lacked any reasonably available means of acquiring knowledge." *Voog, 659 A.2d at 179* (quotation omitted). Matysiak has failed to show that he exercised due diligence in learning about his rights under the CMWA. It was unreasonable for him to delay bringing suit for over six years when he was aware that he was being underpaid and did not attempt to learn whether he had a cause of action. *Gallop v. Commercial Painting Co., Inc., 42 Conn. Supp. 187, 612 A.2d 826, 828 (Conn. 1992)* (holding that estoppel did not toll statute of limitations where defendant gave misleading information about its agent for service of process; plaintiff had alternate means of service readily available); **[*13]** *see also* *Redman v. U.S. W. Bus, Res., Inc., 153 F.3d 691, 695 (8th Cir. 1998)* (holding that defendant employer was not estopped from asserting FLSA statute of limitations where "appellants had every opportunity to ask their Union representatives and/or legal counsel to address their concerns long before the statute of limitations had ran"). Matysiak was clearly able to learn this information, as he alleges that he "began gathering evidence for his lawsuit" immediately after he was terminated. (Doc. 53 ¶ 40.)

The sole case relied upon by Matysiak in support of his estoppel argument, *Wall v. Construction & General Laborers' Union, Local 230, 224 F.3d 168, 176 (2d Cir. 2000)*, is inapplicable. In *Wall*, the defendant labor union promised the plaintiff's that they could become union members again if they were referred for employment. The union then tried to prevent the plaintiff's from being referred. When the plaintiff's were referred for work, they were denied membership. The Second Circuit held that the union was equitably estopped from asserting the statute of limitations defense because the plaintiff's reasonably relied on the union's promise that it would readmit them and delayed bringing suit. *Id.* Unlike *Wall*, it was unreasonable for Matysiak to rely upon Shamas's

alleged misrepresentations for over six years without investigating to see **[*14]** if it was in fact true that he could not be paid the prevailing wage as an undocumented worker.

Matysiak has failed to show that equitable tolling or equitable estoppel applies to his case. Defendants' motion for partial summary judgment on their statute of limitations defense is therefore granted in part, with the following condition.

### iii. Willful Violation of the FLSA

As noted above, the statute of limitations for FLSA claims is two years, "except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued." *29 U.S.C. § 255(a)*. Defendants argue that there is no evidence that they willfully violated the FLSA and therefore Matysiak is only entitled to recover two years' worth of damages if he proves his FLSA claim.

A violation of the FLSA is "willful" if "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133, 108 S. Ct. 1677, 100 L. Ed. 2d 115 (1988)*; *Young v. Cooper Cameron Corp., 586 F.3d 201, 207 (2d Cir. 2009)*. The employee has the burden of showing willfulness. *Young, 586 F.3d at 207*. Whether an employer willfully violated the FLSA is an issue typically left to the trier of fact. *Ramirez v. Rifkin, 568 F. Supp. 2d 262, 268 (E.D.N.Y. 2008)*.

Defendants admit that they never paid Matysiak overtime. (Doc. 63 ¶ 26.) They argue, however, that Matysiak **[*15]** was never entitled to overtime because he has always been an independent contractor. (*Id.*) Because the FLSA overtime provision only applies to "employees," independent contractors are not entitled to overtime pay under the FLSA. See *29 U.S.C. § 207(a)*; *Brock v. Superior Care, Inc., 840 F.2d 1054, 1058 (2d Cir. 1988)*. As discussed below, whether Matysiak was an employee or an independent contractor is an issue that cannot be resolved on summary judgment. For this reason, the court cannot decide at this time whether defendants willfully violated the FLSA. Defendants' motion for summary judgment on this issue is denied without prejudice to their right to raise the issue again at trial.

### C. Plaintiff's Motion for Summary Judgment That He Was An Employee Entitled to Overtime Pay

Matysiak seeks partial summary judgment in the form of a ruling that he was an employee rather than an independent contractor and that defendants are liable to him as a matter of law for unpaid overtime under both the FLSA and the CMWA.

Under the FLSA, an "employee" is "any individual employed by an employer." *29 U.S.C. § 203(e)(1)*. To "employ" means "to suffer or permit to work." *Id. § 203(g)*. These definitions are broad, "in accordance with the remedial purpose of' the FLSA. *Brock, 840 F.2d at 1058*. The CMWA contains nearly identical definitions **[*16]** for these terms as the FLSA, see *Conn. Gen. Stat. § 31-58(d)-(e)*, and is construed similarly. *Roto-Rooter Servs. Co. v. Dep't of Labor, 219 Conn. 520, 593 A.2d 1386, 1390 n.8 (Conn. 1991)*.

In determining whether an individual is an employee or an independent contractor under the FLSA, courts apply the "economic reality test," which looks at five factors. These are:

> (1) the degree of control exercised by the employer over the workers, (2) the workers' opportunity for profit or loss and their investment in the business, (3) the degree of skill and independent initiative required to perform the work, (4) the permanence or duration of the working relationship, and (5) the extent to which the work is an integral part of the employer's business.

*Brock, 840 F.2d at 1058-59*.

The court cannot resolve the issue of whether Matysiak was an employee or an independent contractor at the summary judgment phase because the relevant facts are disputed. For example, the parties dispute how much control Spectrum exercised over Matysiak's work. Matysiak asserts that he only worked for Spectrum, that he was required to work a set schedule from 7:00 a.m. to 3:30 p.m. with a half-hour break for lunch, that he received the same supervision as other employees, that he was required to fill out a time sheet, and that he bought none of his own supplies **[*17]** other than paint brushes. (Doc. 107-1 at 1-3.) In support of these assertions, he provides his own testimony and affidavit, along with a form letter stating Spectrum's policies for employees and a blank timesheet. There are no completed timesheets in the record.

Defendants deny each of these assertions. Defendant Shamas asserts in an affidavit that Spectrum did not assign Matysiak a set schedule or require him to take breaks at specified times, and that Matysiak was free to

work for other companies. (Doc. 113-1 at 4.) He stated that Spectrum did not supervise Matysiak or tell him how to perform tasks, such as how many coats of paint to apply. (*Id.* at 3-4.) He denies that Spectrum ever disciplined Matysiak as it would other employees. He further denies that Matysiak ever filled out a time sheet. (Doc. 113-2 at 4.) Defendants also point to Matysiak's tax returns from 2005 to 2009, which state that Matysiak is self-employed. (Doc. 113-4 at 7-42.) Each year, he took significant tax deductions for business-related supplies such as protective clothing, uniforms, and vehicle expenses. During the same period, Spectrum reported Matysiak's income on a 1099 form rather than a W-2. (*Id.*) Defendants note **[*18]** that Matysiak purchased his own liability insurance and was not provided with employee fringe benefits or safety training required for employees. (Docs. 119 at 4; 113-1 at 4.) Finally, both the Connecticut Department of Revenue Services and the U.S. Department of Labor determined in the course of investigations related to wage withholding and retirement plan contributions that Matysiak was properly classified as an independent contractor. (Doc. 19 at 10.)

These and other facts are genuinely disputed and are material to the issue of whether Matysiak was an employee or an independent contractor under both the FLS A and the CMWA.[1] Resolving the factual disputes will require an assessment of each party's credibility. Such assessments are reserved for the trier of fact. *See Fincher v. Depository Trust & Clearing Corp., 604 F.3d 712, 725 (2d Cir. 2010)*; *see also Evans v. MassMutual Fin. Grp., 856 F. Supp. 2d 606, 610 (W.D.N.Y. 2012)* (denying summary judgment on issue of whether plaintiff was employee under FLSA because underlying facts about his relationship with employer remained in dispute). Accordingly, Matysiak's motion for summary judgment on this issue is denied.

For the same reasons, the court denies Matysiak's motion for summary judgment on the issue of whether defendant Sliamas is personally liable under the FLSA and the CMWA for any alleged violations,[2] It would be

premature to decide this issue before determining whether Matysiak is actually covered by the FLSA and the CMWA.

The court denies defendants' request to impose sanctions upon Matysiak's attorney for filing his motion for partial summary judgment. (Doc. 112 at 33.) Although the court has not ruled in Matysiak's favor, it does not find the motion to be unreasonable or vexatious, and consequently no sanctions are warranted. *See 28 U.S.C. § 1927*.

### III. Conclusion

For the above reasons, defendants' motion for partial summary judgment is GRANTED IN PART, except that summary judgment is denied on the issue of whether defendants willfully violated the FLSA. (Doc. 101.) Plaintiff's motion for partial summary judgment is DENIED. (Doc.106.) Defendants' request for sanctions is DENIED. (Doc.112.)

Dated this 17th day of August, 2015.

/s/ Geoffrey W. Crawford, Judge

United States District Court

---

End of Document

---

[1] The parties appear to disagree over whether the court should apply the "economic reality test" or the "ABC test" to determine Matysiak's status as an employee or independent **[*19]** contractor under Connecticut law. (Docs. 106-1 at 15; 112 at 26.) The court need not resolve this issue because the facts surrounding the parties' employment relationship are genuinely in dispute, precluding summary judgment under either test.

[2] Matysiak has also not put forth sufficient evidence to show that he is entitled to summary judgment on this issue. Like the question of whether an individual is an employee under the FLSA, determining whether an individual is an "employer" under the FLSA requires an examination of the "economic reality" of the relationship. *Irizarry v. Catsimatidis, 722 F.3d 99, 104 (2d Cir. 2013)*. The court must inquire into a number of factors: "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Carter v. Dutchess Cmty. Coll., 735 F.2d 8, 12 (2d Cir. 1984)*. Matysiak **[*20]** relies solely upon the fact that Shamas owns the company. However, the Second Circuit has held that ownership alone is insufficient to establish that an individual is an "employer" under the FLSA. *Irizarry, 722 F.3d at 111*.